UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:22-cv-24054

**KINGMARIA LEONARD**,                 **JURY TRIAL DEMANDED**

*Plaintiff*,

v.

**PEACHTREE HOTEL GROUP II, LLC**
*INDIVIDUALLY AND D/B/A* **ELEMENT MIAMI INTERNATIONAL AIRPORT**,

*Defendant*.
_____/

# COMPLAINT

Plaintiff Kingmaria Leonard, by counsel, complains of Defendant Peachtree Hotel Group II, LLC *Individually and D/B/A* Element Miami International Airport, and alleges as follows:

## INTRODUCTION

1. This case is about a 22-year-old hotel employee who was terminated after and because she reported outrageous sexual harassment perpetrated by her immediate supervisor.

2. Plaintiff Kingmaria Leonard brings this action pursuant Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("**Title VII**"), as amended 42 U.S.C. § 12101 et seq., the Florida Civil Rights Act of 1992, as amended, §760.01, et seq., Florida Statutes ("**FCRA**"), and Sec. 11A-26, Miami-Dade County Ordinances.

## JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 (federal question), 1343(a)(3) (civil rights), 42 U.S.C. §2000e-5(f)(3) (Title VII), and §1367 (supplemental jurisdiction).

Case No. 1:22-cv-24054

4. Venue is proper in the Southern District of Florida under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b) because a substantial portion of the acts or omissions giving rise to this Action occurred in the Southern District of Florida.

## PARTIES

5. Plaintiff Kingmaria Leonard is an individual residing in Miami-Dade County.

6. Peachtree Hotel Group II, LLC individually and d/b/a Element Miami International Airport, ("Defendant"), is a foreign profit corporation, with a principal address in Atlanta, Georgia.

7. Peachtree operates hotel properties throughout the country, including Marriott International, who operates Element Miami International Airport through its subsidiary, Westin.

## ADMINISTRATIVE PREREQUISITES

8. On or about January 25, 2022, Plaintiff timely dual-filed a charge of discrimination (Charge No. 510-2022-02307) with the U.S. Equal Employment Opportunity Commission ("**EEOC**"), and the Florida Commission on Human Relations ("**FCHR**"), and the Miami-Dade Commission on Human Rights ("**MDHR**"), naming, Peachtree Hotel Group II, LLC Individually And D/B/A Element Miami International Airport as the Respondent. Plaintiff checked the boxes for discrimination based on sex and retaliation, and "other," specifying "hostile work environment, retaliatory hostile work environment, hostile work environment culminating in a tangible employment action."

9. On or about October 15, 2022, the EEOC issued Plaintiff her notice of right to sue.

10. Plaintiff commenced this action within 90 days of receipt of her notice to sue.

## FACTUAL ALLEGATIONS

11. Kingmaria Leonard is a 22-year-old woman.

12.     In or around June 2021, Leonard began working for Defendant as a "Night Auditor" at the Element Miami International Airport. Leonard worked at the hotel's front desk, checking in customers, and creating reports.

13.     Plaintiff reported to Brandon Hughes ("Hughes") the hotel's "Auditor," who held supervisor authority over Leonard's employment.

**Defendant Subjects Plaintiff to a Sexually Charged Hostile Work Environment**

14.     Leonard and her coworker, Dominique, would notice how Hughes would be flirtatious with hotel guests.

15.     On or about August 14, 2021, at around 7 A.M., Hughes approached Leonard, and said, "Your shirt is inappropriate." Leonard looked at herself and offered to put on a coverup shirt. Another employee agreed with Hughes and said, "Your titties are out."

16.     Later in or around August 2021, Hughes asked Leonard if she wanted to drink at work. Leonard thought Hughes was joking because, after all, they were at work. Leonard said, "I'm not really a drinker—give me a little." Hughes spoke about his sex life and bragged about how many women he sleeps with regularly. Hughes made Leonard extremely uncomfortable. She sat there quiet, listening, and be polite, but feeling incredibly uncomfortable. Fortunately, a guest arrived, and relieved Leonard from an extremely uncomfortable situation.

17.     On another day, Leonard worked the overnight shift with Hughes. Leonard worked the front desk while Hughes remained from the back office. Leonard was extremely uncomfortable when Hughes began playing sexual R&B music.

18.     Leonard told Dominique about the night and teased Leonard, asking if she had slept with Hughes. Leonard said no, and the two spoke about how inappropriate he was, flirting with not only the guests, but the employees.

19. All he did was speak about sex to Leonard, and she was extremely offended that Hughes—as Plaintiff's manager—did not take her seriously as an employee.

20. Leonard's frustration only grew deeper when Hughes said, "I can fold you up, pick you up and take you into to a bedroom."

### **Manager Texts Plaintiff Nude, Graphic Photos of Erect Penis**

21. In or around mid-August of 2021, Hughes approached Leonard and said, "Can you keep a secret?" Leonard had no idea what he was taking about because every time she said yes, or that she was not interested, all Hughes would respond to Leonard was, "Can you keep a secret." Hughes said, "I'm gonna text you the secret when you get home."

22. On or about August 27, 2021, after Hughes once again asked Leonard if she could keep a secret, Hughes said, "I'll text you," and when he texted Leonard, Hughes stated, "Can you keep a secret." And, once again, Leonard said that she could, thinking Hughes would tell her something work related.

23. Leonard was working from 3 PM to 11 PM, while Hughes had left at 10 PM. Leonard asked Hughes about an issue with guest.

24. At 10:13 PM, Hughes texted Leonard: "I'm about to send you a bad picture kk." Leonard responded at 10:20 PM, in the last hour of her shift, believing it was a typical work-related issue with an unruly guest, said, "OK."

25. At 10:21 PM, Hughes texted Plaintiff: (1) a photograph of Hughes in a towel wrapped around his waist low, (2) full frontal nude photograph of Hughes, showing his erect penis.

26. Leonard was at work, behind the front desk, tending to the overnight shift. Leonard was shaken by the outrageous nature of Hughes, her immediate supervisor, sending graphic photos of his erect penis to his subordinate employee.

27. At 1:01 A.M., Hughes texted yet another full-frontal nude body shot, which again exposed erect penis.

28. Leonard was offended, outraged, and disgusted when Hughes texted "I hope you can show me what I'm in for [emoji]." Leonard felt pressured by her immediate supervisor to send him nude photographs of herself. Plaintiff refused.

29. When Dominique came to relieve Leonard from her shift, Leonard said, "You won't believe what Hughes sent my phone—a whole bunch of naked pictures." Dominique thought Leonard was kidding. Leonard said, "I swear to God."

30. Leonard was off the next day, which she spent crying, distressed from Hughes.

31. On August 18, 2022, Hughes confronted Leonard. He said, "You didn't text me back, I thought you were gonna send me pictures."

32. Plaintiff never stated that she would send Hughes pictures of herself. The thought of doing same disgusted Plaintiff.

**Peachtree Terminates Plaintiff After & Because She Reported Sexual Harassment**

33. On or about September 2, 2021, Leonard reported Hughes sexual misconduct to Krystal, the General Manager.

34. Leonard reported that Hughes sent her graphic nude photos of his body and his erect penis. Leonard reported Hughes made unwanted sexual advances and asked in exchange for photos of Leonard, telling Krystal that Hughes wrote, "I hope you can show me what I'm in for."

35. Plaintiff told Krystal that she wanted Defendant to act to stop Hughes. Leonard explained she was outraged and offended by her supervisor's misconduct.

36. But after a few days passed, and Defendant took no corrective action. Plaintiff again approached Krystal to see what Defendant was doing regarding Hughes.

37. Krystal terminated Plaintiff's employment after she asked about any sexual harassment investigation following her initial reporting of Hughes' outrageous sexual misconduct.

38. Krystal removed Plaintiff from all work accounts.

39. Jonathan texted Leonard and said, "Why did you leave the job?" Plaintiff made clear that she did not "leave the job," but that she was terminated. Leonard said, "Krystal fired me because I complained about [Hughes]."

40. About twenty minutes later, Krystal called Leonard saying she wanted to investigate. Leonard said, "I'm not even your employee anymore, you fired me."

41. Defendant still employs Hughes as an auditor at another location.

42. Leonard was disgusted by the fact that Defendant did not take any disciplinary action against Hughes.

43. Leonard, on the other hand, is unemployed.

44. Peachtree offered no legitimate reason for terminating Plaintiff's employment.

45. Defendant terminated Plaintiff's employment because she reported Hughes.

46. To be sure, Defendant never provided any performance issues to Plaintiff, and would not have terminated Plaintiff's employment had she not reported Hughes.

47. The above are some examples of unlawful discrimination and retaliation Defendant subjected Plaintiff to on a continuous and on-going basis throughout her employment.

48. Defendant unlawfully discriminated against Plaintiff because of her sex and because she opposed and reported sexual misconduct against.

49. Defendant should be punished for its willful and knowing discriminatory employment practices directed at Plaintiff.

50. Plaintiff claims Defendant aggravated, activated, or exacerbated any preexisting conditions, as a result of its unlawful conduct, alleged above.

51. As a result of Defendant's unlawful conduct, Plaintiff has suffered damages, including, but not limited to, financial and economic damages, lost wages (back pay and front pay) and benefits, advancement opportunities with Defendant, and continues to suffer the same.

52. Plaintiff has also suffered—and has a record of suffering—emotional distress, mental anguish, loss of personal dignity, and other intangible damages.

53. Plaintiff also seeks punitive damages against Defendant for willfully failing to conduct a sexual harassment investigation and terminating Plaintiff's employment.

54. At bottom, Defendant is liable for depriving Plaintiff of her personal dignity and her civil right to pursue an equal employment opportunity in a work environment free from unrelenting discrimination, harassment, and retaliation.

## CAUSES OF ACTION

### COUNT I
### Title VII, 42 U.S.C. § 2000e-2(a)
### Hostile Work Environment – Sex

55. Plaintiff reincorporates the allegations in paragraphs 11-53.

56. Defendant violated Title VII by subjecting Plaintiff to an objectively hostile and abusive working environment that was severe or pervasive enough to alter Plaintiff's employment.

57. Plaintiff is a woman and is thus a member of a protected class.

58. Defendant subjected Plaintiff to sexual humiliation and unwanted sexual advances because of Plaintiff's sex.

59. Plaintiff's immediate supervisor, Hughes, asked Plaintiff to drink at work, played sexual R&B music, and spoke about his sex life to Plaintiff, bragging about how many women he sleeps with routinely.

60. Plaintiff's supervisor told her, "I can fold you up, pick you up and take you into to a bedroom." So the harassment was also physically threatening in a sexual nature.

61. Plaintiff's immediate supervisor texted multiple nude photos of himself, including his erect penis in full view to Plaintiff.

62. Plaintiff's immediate supervisor texted Plaintiff, "I hope you can show me what I'm in for [emoji]."

63. Plaintiff was offended by Hughes sending nude photographs of his erect penis.

64. The next day, Hughes told Plaintiff, "You didn't text me back, I thought you were gonna send me pictures."

65. Any reasonable person in Plaintiff's position would find an immediate supervisor text messaging multiple nude photos including his erect penis, and texting, "I thought you were gonna send me pictures," and "I hope you can show me what I'm in for," was objectively offensive.

66. Moreover, the above necessarily affected the terms of Plaintiff's employment because Hughes texted nude photos of himself while Plaintiff was working, and likewise made unwanted sexual advances while at work.

67. Defendant did not conduct a sexual harassment investigation.

68. Defendant terminated Plaintiff's employment after she reported Hughes.

69. Taken together, the above allegations give rise to the reasonable inference that Defendant violated Title VII by discriminating against Plaintiff in the terms, conditions, and privileges of Plaintiff's employment because of her sex.

70. As an actual and proximate result of Defendant's unlawful employment practices in violation of Title VII, Plaintiff has suffered damages.

## COUNT II
### FCRA § 760.10(a)(1)
### Hostile Work Environment – Sex

71. Plaintiff reincorporates the allegations in paragraphs 11-53.

72. Defendant violated the FCRA by subjecting Plaintiff to an objectively hostile and abusive working environment that was severe or pervasive enough to alter the terms of Plaintiff's employment.

73. Plaintiff is a woman and is thus a member of a protected class.

74. Defendant subjected Plaintiff to sexual humiliation and unwanted sexual advances because of Plaintiff's sex.

75. Plaintiff's immediate supervisor, Hughes, asked Plaintiff to drink at work, played sexual R&B music, and spoke about his sex life to Plaintiff, bragging about how many women he sleeps with routinely.

76. Plaintiff's supervisor told her, "I can fold you up, pick you up and take you into to a bedroom." So the harassment was also physically threatening in a sexual nature.

77. Plaintiff's immediate supervisor texted multiple nude photos of himself, including his erect penis in full view to Plaintiff.

78. Plaintiff's immediate supervisor texted Plaintiff, "I hope you can show me what I'm in for [emoji]."

79. Plaintiff was offended by Hughes sending nude photographs of his erect penis.

80. The next day, Hughes told Plaintiff, "You didn't text me back, I thought you were gonna send me pictures."

81. Any reasonable person in Plaintiff's position would find an immediate supervisor text messaging multiple nude photos including his erect penis, and texting, "I thought you were gonna send me pictures," and "I hope you can show me what I'm in for," was objectively offensive.

82. Moreover, the above necessarily affected the terms of Plaintiff's employment because Hughes texted nude photos of himself while Plaintiff was working, and likewise made unwanted sexual advances while at work.

83. Defendant did not conduct a sexual harassment investigation.

84. Defendant terminated Plaintiff's employment after she reported Hughes.

85. Plaintiff was offended by Hughes sending nude photographs of his erect penis.

86. Taken together, the above allegations give rise to the reasonable inference that Defendant violated the FCRA by discriminating against Plaintiff in the terms, conditions, and privileges of Plaintiff's employment because of her sex.

87. As an actual and proximate result of Defendant's unlawful employment practices in violation of the FCRA, Plaintiff has suffered damages.

### COUNT III
### § 11A-26(1)(A) – Miami-Dade County Code
### Hostile Work Environment – Sex

88. Plaintiff reincorporates the allegations in paragraphs 11-53.

89. Defendant violated the Miami-Dade County Ordinances section 11A-26 by subjecting Plaintiff to an objectively hostile and abusive working environment that was severe or pervasive enough to alter the terms of Plaintiff's employment.

90. Plaintiff is a woman and is thus a member of a protected class.

91. Defendant subjected Plaintiff to sexual humiliation and unwanted sexual advances because of Plaintiff's sex.

92. Plaintiff's immediate supervisor, Hughes, asked Plaintiff to drink at work, played sexual R&B music, and spoke about his sex life to Plaintiff, bragging about how many women he sleeps with regularly.

93. Plaintiff's supervisor told her, "I can fold you up, pick you up and take you into to a bedroom." Thus, the harassment was also physically threatening in a sexual nature.

94. Plaintiff's immediate supervisor texted multiple nude photos of himself, including his erect penis in full view to Plaintiff.

95. Plaintiff's immediate supervisor texted Plaintiff, "I hope you can show me what I'm in for [emoji]."

96. Plaintiff was offended by Hughes sending nude photographs of his erect penis.

97. The next day, Hughes told Plaintiff, "You didn't text me back, I thought you were gonna send me pictures."

98. Any reasonable person in Plaintiff's position would find that an immediate supervisor text messaging multiple nude photos including his erect penis, and texting, "I thought you were gonna send me pictures," and "I hope you can show me what I'm in for," was objectively offensive.

99. Moreover, the above necessarily affected the terms of Plaintiff's employment because Hughes texted nude photos of himself while Plaintiff was working, and likewise made unwanted sexual advances while at work.

100. Defendant did not conduct a sexual harassment investigation.

101. Defendant terminated Plaintiff's after she reported Hughes' sexual misconduct.

102. Taken together, the above allegations give rise to the reasonable inference that Defendant violated the Miami-Dade County Ordinances section 11A-26 by discriminating against Plaintiff in the terms, conditions, and privileges of Plaintiff's employment because of her sex.

103. As an actual and proximate result of Defendant's unlawful employment practices in violation of Miami-Dade County Ordinances section 11A-26, Plaintiff has suffered damages.

## COUNT IV
### Title VII, 42 U.S.C. § 2000e-3(a)
### Retaliation

104. Plaintiff reincorporates the allegations in paragraphs 24-62.

105. Defendant violated Title VII's anti-retaliation provision by taking materially adverse actions against Plaintiff after and because she reported sexual harassment.

106. On September 2, 2022, Plaintiff engaged in protected activity by reported that Hughes had sent Plaintiff nude photos of himself and demanded Plaintiff to send photos of herself.

107. Plaintiff reasonably and in good faith believed that a supervisor sending her graphic nude photographs of his erect penis and asking for photos of Plaintiff in exchange was unlawful.

108. Plaintiff suffered materially adverse actions after and because Plaintiff engaged in protected activity.

109. Defendant terminated Plaintiff's employment days after she reported sexual harassment.

110. The above-described actions are materially adverse because any reasonable worker well might be dissuaded about opposing or supporting a charge of discrimination if she knew her supervisors would terminate her employment for reporting sexual harassment

111. Plaintiff's sexual harassment complaints and the above-described materially adverse actions are causally connected based on temporal proximity and because Krystal was aware of Plaintiff's protected activity when Krystal terminated Plaintiff's employment.

112. Accordingly, Plaintiff can establish a causal connection between her protected activity and subsequent materially adverse actions.

113. Taken together, the above allegations give rise to the reasonable inference that Defendant violated Title VII by terminating Plaintiff's employment after and because Plaintiff complained that she was sexually harassed at work.

114. As a result of Defendant employment practices in violation of the FCRA, Plaintiff has suffered damages.

## COUNT V
## FCRA § 760.10(7)
## Retaliation

115. Plaintiff reincorporates the allegations in paragraphs 24-62.

116. Defendant violated the FCRA's anti-retaliation provision by taking materially adverse actions against Plaintiff after and because she reported sexual harassment.

117. On September 2, 2022, Plaintiff engaged in protected activity by reported that Hughes had sent Plaintiff nude photos of himself and demanded Plaintiff to send photos of herself.

118. Plaintiff reasonably and in good faith believed that a supervisor sending her graphic nude photographs of his erect penis and asking for photos of Plaintiff in exchange was unlawful.

119. Plaintiff suffered materially adverse actions after and because Plaintiff engaged in protected activity.

120. Defendant terminated Plaintiff's employment days after she reported sexual harassment.

121. The above-described actions are materially adverse because any reasonable worker well might be dissuaded about opposing or supporting a charge of discrimination if she knew her supervisors would terminate her employment for reporting sexual harassment

122. Plaintiff's sexual harassment complaints and the above-described materially adverse actions are causally connected based on temporal proximity and because Krystal was aware of Plaintiff's protected activity when Krystal terminated Plaintiff's employment.

123. Accordingly, Plaintiff can establish a causal connection between her protected activity and subsequent materially adverse actions.

124. Thus, Defendant violated the FCRA by terminating Plaintiff's employment after and because Plaintiff complained that she was sexually harassed at work.

125. As a result of Defendant employment practices in violation of the FCRA, Plaintiff has suffered damages.

## COUNT VI
## § 11A-26
## Retaliation

126. Plaintiff reincorporates the allegations in paragraphs 24-62.

127. Defendant violated the Miami-Dade County Code's anti-retaliation provision by taking materially adverse actions against Plaintiff after and because she reported sexual harassment.

128. On September 2, 2022, Plaintiff engaged in protected activity by reported that Hughes had sent Plaintiff nude photos of himself and demanded Plaintiff to send photos of herself.

129. Plaintiff suffered materially adverse actions after and because Plaintiff engaged in protected activity.

130. Defendant terminated Plaintiff's employment after she reported sexual harassment.

131. The above-described actions are materially adverse because any reasonable worker well might be dissuaded about opposing or supporting a charge of discrimination if she knew her supervisors would terminate her employment for reporting sexual harassment

132. Plaintiff's sexual harassment complaints and the above-described materially adverse actions are causally connected based on temporal proximity and because Krystal was aware of Plaintiff's protected activity when Krystal terminated Plaintiff's employment.

133. Accordingly, Plaintiff can establish a causal connection between her protected activity and subsequent materially adverse actions.

134. Thus, Defendant violated the Miami-Dade County Code by terminating Plaintiff's employment after and because Plaintiff reported that she was sexually harassed at work.

135. As a result of Defendant employment practices in violation of the Miami-Dade County Ordinances, Plaintiff has suffered damages.

## COUNT VII
### Title VII, 42 U.S.C. § 2000e-2(a)
### Hostile Work Environment – Sex
### (Culminating in a tangible employment action)

136. Plaintiff reincorporates the allegations in paragraphs 11-53.

137. Alternatively, Defendant subjected Plaintiff to a hostile work environment which resulted in a tangible employment action.

138. Plaintiff's immediate supervisor, Hughes, asked Plaintiff to drink at work, played sexual R&B music, and spoke about his sex life to Plaintiff, bragging about how many women he sleeps with routinely.

139. Plaintiff's supervisor told her, "I can fold you up, pick you up and take you into to a bedroom." So the harassment was also physically threatening in a sexual nature.

140. Plaintiff's immediate supervisor texted multiple nude photos of himself, including his erect penis in full view to Plaintiff.

141. Plaintiff's immediate supervisor texted Plaintiff, "I hope you can show me what I'm in for [emoji]."

142. Plaintiff's immediate supervisor text messaged Plaintiff nude photographs of himself, and requested Plaintiff send him photographs of herself.

143. Plaintiff refused to send her supervisor nude photos of herself.

144. Hughes influenced Plaintiff's termination after and because Plaintiff denied his sexual advances.

145. Taken together, the above allegations give rise to the reasonable inference that Defendant violated Title VII by discriminating against Plaintiff in the terms, conditions, and privileges of her employment because of her sex.

146. Defendant is strictly liable for the hostile work environment culminating in Plaintiff's termination.

147. As an actual and proximate result of the Company's unlawful employment practices in violation of the FCRA, Plaintiff has suffered damages.

### COUNT VIII
### FCRA § 760.10(1)(a)
### Hostile Work Environment - Sex
### (Culminating in a tangible employment action)

148. Plaintiff reincorporates the allegations in paragraphs 11-53.

149. Defendant subjected Plaintiff to a hostile work environment which culminated in a tangible employment action.

150. Plaintiff's immediate supervisor, Hughes, asked Plaintiff to drink at work, played sexual R&B music, and spoke about his sex life to Plaintiff, bragging about how many women he sleeps with routinely.

151. Plaintiff's supervisor told her, "I can fold you up, pick you up and take you into to a bedroom." So the harassment was also physically threatening in a sexual nature.

152. Plaintiff's immediate supervisor texted multiple nude photos of himself, including his erect penis in full view to Plaintiff.

153. Plaintiff's immediate supervisor texted Plaintiff, "I hope you can show me what I'm in for [emoji]."

154. Plaintiff's immediate supervisor text messaged Plaintiff nude photographs of himself, and requested Plaintiff send him photographs of herself.

155. Plaintiff refused to send her supervisor nude photos of herself.

156. Hughes influenced Plaintiff's termination after and because Plaintiff denied his sexual advances.

157. Taken together, the above allegations give rise to the reasonable inference that Defendant violated FCRA § 760.10(1)(a) by discriminating against Plaintiff in the terms, conditions, and privileges of her employment because of her sex.

158. Defendant is strictly liable for the hostile work environment culminating in Plaintiff's termination.

159. As an actual and proximate result of the Company's unlawful employment practices in violation of the FCRA, Plaintiff has suffered damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendant:

Case No. 1:22-cv-24054

      A.      Under FCRA § 760.11(5), and Title VII § 102(b)(3) an award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for all monetary and economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

      B.      Under FCRA § 760.11(5), and Title VII § 102(b)(3) an award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses

      C.      Under FCRA § 760.11(5) and Title VII § 102(b)(3), an award of punitive damages for damages arising from the Company's discriminatory employment practices, with malice or with reckless indifference to Plaintiff's rights.

      D.      Under FCRA § 760.11(5) and Title VII § 102(b)(3), an award of costs that Plaintiff has incurred, as well as Plaintiff's reasonable attorneys' fees plus interest as much as is lawful;

      E.      Such other relief the Court deems just and proper.

## JURY DEMAND

Plaintiff Kingmaria Leonard demands a jury trial of all issues so triable under Title VII and the Federal Rules of Civil Procedure.

Dated: December 14, 2022                Respectfully submitted,

*Brett Daniel Kaplan*
_____
Brett Daniel Kaplan, Esq.
Florida Bar No. 1031866
Email: brett@bkaplaw.com
**BRETT D. KAPLAN, P.A.**
2101 Ludlam Road, Suite 704
Miami, Florida 33155
Telephone: (954) 529-8328
*Counsel for Plaintiff Kingmaria Leonard*